# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2021

Lyle W. Cayce
Clerk

No. 19-50717

Richard Belliveau,

*Plaintiff—Appellant*,

*versus*

Barco, Incorporated; Barco, N.V.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-379

Before Davis, Jones, and Willett, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

Critical to this appeal is under what circumstances Texas law authorizes a claim against a corporate shareholder for the corporation's breach of contract. *See* Tex. Bus. Orgs. Code ("TBOC") § 21.223. In 2007, Richard Belliveau, a prolific inventor in the field of lighting technology, licensed his intellectual property exclusively to High End Systems, Inc. ("High End"). Several years later, High End became a wholly owned

subsidiary of appellees Barco, N.V. (collectively, "Barco"[1]). When Barco decided to sell High End to a third party in 2017, Barco and Belliveau fell out and litigation ensued. Pertinent here, Belliveau appeals the district court's summary judgment rejecting, *inter alia*, his attempt to pierce High End's corporate veil and hold Barco liable for the subsidiary's breach of contract. For the reasons that follow, we AFFIRM.

## I. BACKGROUND

Over a forty-year career, Belliveau touts that he has provided lighting systems for a variety of high-profile events, from Beyoncé concerts to the "Royal Wedding." Three decades ago, Belliveau co-founded High End, a professional lighting company. Belliveau's involvement in High End has been on and off. In 1998, he separated himself from the company, but in 2004, he rejoined as the company's chief technology officer.

In 2007, Belliveau and High End entered into an Exclusive License and Operation Agreement (the "High End License"), which granted High End an exclusive license to all the intellectual property Belliveau had created between his 1998 separation from High End and his 2004 reemployment, together with an option to license all of his future IP. The License gave High End, "in its sole discretion," the right to license or sublicense Belliveau's intellectual property so long as High End used "commercially reasonable efforts to commercialize" it. Belliveau received a guaranteed annual royalty (subject to an initial $200,000 floor and approximately $350,000 cap, both with annual cost of living adjustments) for High End's exploitation of the Licensed IP. Until Belliveau resigned, he had never received less than this royalty cap. He also received a royalty on sublicensing proceeds, $120,000

---

[1] The formal name of High End was later changed to Barco, Inc., but we use "High End" for simplicity. Barco, Inc. was and remains a (nominal) defendant.

annually for the first several years of the License, which thereafter became a 50/50 split.    The High End License also acknowledged Belliveau's employment as the company's Chief Technology Officer and provided that his salary would be deducted from the guaranteed annual royalty.[2]

A year after the parties executed the High End License, Barco acquired all of High End's stock and other securities for $55 million.  For nearly a decade, the three parties worked well together.  High End signed several sublicenses, some of which yielded Belliveau substantial sublicense royalties.  Belliveau worked closely with both Barco and High End in negotiating these sublicense agreements.

High End, however, did not prosper.  By 2016, Barco had lost a lot of money on High End and was searching for a purchaser.  At the end of January 2017, Barco signed a letter of intent with potential buyer Electronic Theater Controls, Inc. ("ETC") outlining a stock purchase.  High End was going to be sold for merely $7.5 million.  During the negotiating period, Belliveau took umbrage at Barco's tactics and failure to appreciate his position.

In February, as part of the sale's due diligence process, a Barco executive contacted Belliveau and asked him to shed some light on which of Belliveau's patents covered Barco products.   Belliveau responded by suggesting that "if Barco chooses to divest in this situation then it might be best to contract back [a] license to intellectual property in the contract of sale."  Belliveau alleges he was assured "he would be kept appraised [sic] of the deal terms and would have a role in approving them."    But ETC executives did not include Belliveau in the negotiations, and Belliveau eventually learned that ETC would be changing his employment status from

---

[2] This is a bare summary of the complex formulae for Belliveau's various payments under the High End License.

CTO to that of an independent contractor following the buyout. Belliveau, incensed, resigned.

Meanwhile, High End and Barco, N.V. began negotiating a License and Royalty Allocation Agreement (the "Barco Sublicense"), which was executed on March 24, 2017. It is undisputed that ETC was involved in negotiating the Barco Sublicense, but the agreement was between High End and Barco. The Barco Sublicense granted Barco a "non-transferable, non-exclusive, perpetual, irrevocable, and non-terminable, world-wide license and/or sublicense" to, *inter alia*, High End's (and Belliveau's) current patent portfolio as well as Belliveau's future IP, for which High End had exercised the option granted in the High End License. Barco paid $75,000 as a lump sum in consideration of the license, sublicense, and releases conferred in the agreement, but it agreed not to make or sell any licensed products for four years. The parties agreed to negotiate a mutually acceptable royalty for future sales following that non-competition period.

Belliveau asserts that High End had no employees, in-house counsel, or outside counsel independent of Barco throughout the negotiations. Five days after executing the Barco Sublicense, Barco sold High End to ETC. Belliveau alleges he was kept completely in the dark as to the Barco Sublicense and did not discover it until months later.

Shortly after ETC's purchase of High End, Belliveau amended his petition in a preexisting state court lawsuit originally filed against High End. He nonsuited the claims against High End and named Barco, Inc. and Barco, N.V. as defendants. Belliveau's complaint asserted claims against Barco including breach of contract, breach of fiduciary duty, and fraud by nondisclosure arising out of the events leading up to the sale of High End. The case was removed to federal court. Following discovery, the district

court granted summary judgment in favor of Barco on all claims. Belliveau timely appealed.

## II. DISCUSSION

Challenging the district court's summary judgment, Belliveau contends that High End breached the High End License by sublicensing all of his intellectual property to Barco for unreasonably low value. He seeks to pierce High End's corporate veil and hold Barco liable for the breach. Additionally, Belliveau alleges that Barco owed him a fiduciary duty that was breached when Barco executed the Barco Sublicense. Based on the same alleged fiduciary relationship, Belliveau contends Barco committed fraud by failing to disclose to him the details of the Barco Sublicense. We address each issue in turn.

### A. Standard of Review

This court reviews the district court's grant of summary judgment de novo. *Five Star Royalty Partners, Ltd. v. Mauldin*, 973 F.3d 367, 371 (5th Cir. 2020). Summary judgment is appropriate when the movant is entitled to judgment as a matter of law and there is no genuine dispute of material fact. *Id;* FED. R. CIV. P. 56(a). "[T]he inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)).

### B. Piercing the Corporate Veil

Belliveau first contends that High End breached its contract because the Barco Sublicense was not a commercially reasonable sublicense of his intellectual property. "Because corporations offer their shareholders limited liability, a plaintiff seeking to impose individual liability on a shareholder

must pierce the corporate veil to do so." *In re Ritz*, 832 F.3d 560, 566 (5th Cir. 2016). Rather than sue High End, however, Belliveau has opted to sue its sole shareholder, Barco. Thus, Belliveau must "pierce the corporate veil."

Texas law enforces contracts but disfavors extra-contractual remedies, such as allowing creditors of Texas business entities to sue their owners. Due to "amendments to Article 2.21 of the TBCA in 1989 and several subsequent legislative sessions, veil piercing is now addressed by statute in Texas in such a way that piercing the corporate veil to impose personal liability for a contractual, or contractually related, obligation of a corporation is quite difficult." Elizabeth S. Miller, *The Limits of Limited Liability: Veil Piercing and Other Bases of Personal Liability of Owners, Governing Persons, and Agents of Texas Business Entities*, State Bar of Texas, 13th Annual Advanced Real Estate Strategies ch. 4, 2 (2019). Texas law thus insulates a shareholder from a corporation's contractual or contractually related obligations "on the basis that the holder . . . is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory." TBOC § 21.223(a)(2). Section 21.223(b), however, creates an exception to this limitation. A shareholder may be held personally liable for a corporation's obligations "if the obligee demonstrates that the . . . beneficial owner . . . caused the corporation to be used for the purpose of perpetrating and did perpetrate an *actual fraud* on the obligee primarily for the *direct personal benefit* of the . . . beneficial owner." *Id.* § 21.223(b) (emphasis added). *See Willis v. Donnelly*, 199 S.W.3d 262, 271–72 (Tex. 2006) (discussing "narrowly prescribed . . . circumstances under which a shareholder can be held liable for corporate debts" under then-TBCA Art. 2.21).

Thus, to hold Barco liable for High End's alleged breach of contract, Belliveau must show that Barco (the then-shareholder) used High End (the

corporation) to (1) "perpetrate an actual fraud" (2) primarily for Barco's "direct personal benefit." *In re Ritz*, 832 F.3d 560, 566 (5th Cir. 2016) (citing *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2009)).

Belliveau argues that the fraud, in this instance, was High End's execution of the Barco Sublicense. He explains that Barco used High End to perpetrate an actual fraud by having High End sublicense Belliveau's intellectual property to Barco at a price well below market value. Barco does not dispute that the Barco Sublicense gave Barco a direct personal benefit. Nor does Barco challenge the merits of Belliveau's underlying breach of contract claim.[3] The sole issue on appeal, then, is whether Belliveau met his burden of raising a fact issue regarding "actual fraud."

In the veil-piercing context, Texas courts have held that "actual fraud is not equivalent to the tort of fraud." *In re Ritz*, 832 F.3d at 567 (internal quotations omitted). Some courts have held, for instance, that proving a material misrepresentation may not be required—even in connection with contractually originated claims. *See, e.g., TransPecos Banks v. Strobach*, 487 S.W.3d 722, 730 (Tex. App.—El Paso 2016, no pet.); *Latham v. Burgher*, 320 S.W.3d 602, 606–07 (Tex. App.—Dallas 2010, no pet.); *Dick's Last Resort of W. End, Inc. v. Mkt./Ross, Ltd.*, 273 S.W.3d 905, 909–10 (Tex. App.—Dallas 2008, pet. denied); *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 584 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Rather, "actual fraud involves 'dishonesty of purpose or intent to deceive,'"

---

[3] Barco perfunctorily argues for the first time on appeal that Belliveau cannot show High End breached the High End License. The issue is waived as insufficiently briefed. *See Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) (considering a "passing reference" to a claim in an appellate brief insufficient). In any event, Barco cannot raise an argument for the first time [on appeal]. *See Flex Frac Logistics, L.L.C. v. N.L.R.B.*, 746 F.3d 205, 208 (5th Cir. 2014) ("[A]rguments raised for the first time on appeal are waived.").

*In re Ritz*, 832 F.3d at 567, and is "characterized by deliberately misleading conduct," *Shook v. Walden*, 368 S.W.3d 604, 620 (Tex. App.—Austin 2012, pet. denied). Because "direct evidence of actual fraud is scarce," *id.*, "[c]ourts may deduce fraudulent intent from all of the facts and circumstances," *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013). This has court emphasized the overall purpose of the statute, however, to strike a balance in economic regulation between contract claimants, who may protect themselves *ex ante,* and tort claimants who have no such opportunity. *Id.* at 444 (quoting *Shook,* 368 S.W.3d at 619–20).

Citing many of these authorities, the district court held that Belliveau was unable to demonstrate actual fraud. The court noted that the execution of a sublicense, standing alone, was permitted by the High End License and not evidence of actual fraud. It found that Belliveau did not provide sufficient evidence that the Barco Sublicense was undervalued.[4] The court also explained that Belliveau had not contracted around the risk that High End might use inadequate efforts to commercialize his IP. And the court faulted Belliveau for not pursuing a claim against High End instead of Barco.

Belliveau cobbles together circumstantial evidence to argue that there exists a material issue of fact concerning actual fraud. First, he relies on his expert's opinion that estimates the fair market value of Barco's rights under the Barco Sublicense was well over $100 million (discounted over ten years). Belliveau argues that the $75,000 consideration paid for the Barco Sublicense was grossly inadequate and evidence of fraudulent intent.[5]

---

[4] At the time of the district court's initial summary judgment ruling, Belliveau had failed to submit his expert's damage opinion, though he did offer it prior to the court's ruling on his motion to reconsider.

[5] Belliveau considers that the Barco Sublicense admitted actual fraud in statements to the effect that the $75,000 royalty was based on all the circumstances of the transaction

No. 19-50717

Extremely insufficient consideration may provide, at least in the fraudulent transfer context, evidence of actual fraud. *See Spring Street*, 730 F.3d at 445 (finding actual fraud based, *inter alia*, on the fact that the transferee in fraud of creditors "paid no consideration for a 25% interest each in his assets"); *see also In re Ritz,* 832 F.3d at 568. But as Barco points out, the Barco Sublicense's $75,000 payment did not include sublicense rights. In addition, Barco agreed not to sell for four years certain competing Licensed Products that include lighting control systems, after which the parties were required to negotiate a mutually agreeable royalty for such sales.

In any event, this was not the first time High End had sublicensed Belliveau's intellectual property for an arguably small monetary consideration. The record indicates High End sublicensed Belliveau's intellectual property in 2013 for *no* monetary fee. Similarly, High End had previously issued sublicenses in exchange for multiple cross-licenses to the purchaser's patents. And it bears emphasis that these were transactions in which Belliveau confirms he was "intimately involved." *See S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 88 (Tex. 2003) (finding no evidence of "conduct involving dishonesty of purpose" or "intent to deceive" when the conduct underlying a breach of contract claim was "well known to the [plaintiff]").

But the overriding point as to the alleged insufficiency of the royalty is that Belliveau at most complains about a breach of his own High End License. "[T]o impose individual liability for corporate contractual obligations," a claimant must have been unable to foresee and contractually avert potential risks. *Shook*, 368 S.W.3d at 620. The *Shook* court also

---

and thus not a "precedent" for determining a reasonable royalty in the future. This was, however, a statement of fact, not a concession.

explained that "contract claimants, unlike most third parties suing in tort, have voluntarily chosen to deal with the corporation and, '[a]bsent some deception or fraud,' would have had the opportunity to apportion, through negotiated contract terms, the risk that the entity would be unable to meet its obligations." *Id.* (quoting *Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 375 (Tex. 1984)).

Belliveau is correct that High End contractually agreed to "use commercially reasonable efforts to commercialize" his intellectual property. A breach of this provision, however, is not enough to support veil piercing. For instance, although the High End License bears the hallmarks of intense negotiation by sophisticated parties, there is no clause that required Belliveau's specific approval for sublicenses or that prohibited sublicenses to affiliates of High End. Nor had he any right to approve minimum royalties to be paid under each sublicense. Nor had he a contractual right to approve the sale of High End. Nor is the term "commercially reasonable efforts" expressly applicable to every single sublicense, as opposed to the overall "commercial reasonableness" of High End's commercialization efforts.[6] The Barco Sublicense is also non-exclusive, meaning that High End remained in a position to execute any other sublicenses it might see fit in a commercially reasonable manner.

The High End License could have provided a number of alternative contractual measures to protect Belliveau's interests and ward off claims he is now asserting. As it stands, this is a breach of contract case. The Texas statute does not authorize Belliveau to sue Barco, the shareholder, simply for

---

[6] Indeed, here, the four-year noncompete by Barco may have provided a "commercially reasonable" benefit to High End, and thus to Belliveau, as it allowed High End to continue to sell certain Licensed Products free of Barco's competition during that period.

operating according to the terms of the contract—even if Barco may have committed a breach—by artfully pleading dishonesty and intent to deceive. *See* TBOC § 21.223. Dramatic as the expert's opinion of Belliveau's damages appears to be, this is not a case in which Barco attempted to purloin High End's assets in order to deprive Belliveau of the benefit of his High End License rights to a minimum royalty or sublicense royalties in general. The parties' dispute here, if anything, is about one particular sublicense royalty provision, not a denuding of the company to avoid a creditor. *Compare In re Ritz*, 832 F.3d at 563 (defendant drained corporation of assets by transferring funds to other entities he controlled in efforts to defraud creditor).

Belliveau also argues that Barco's intent to deceive or dishonest purpose may be inferred from the fact that he was kept in the dark, not only about the Barco Sublicense, but also about ETC's impending "demotion" of him to an independent contractor status. As to the first charge, the Barco Sublicense was signed after Belliveau had filed suit in an attempt to stop the acquisition. Since Belliveau himself had proposed such a sublicense, and since the High End License gave him no right to pre-approve sublicenses, this should not in itself have come as a surprise. As to the second charge, neither Barco nor Belliveau could control ETC's employment decisions following its takeover.[7]

Belliveau next points to a statement in the Barco Sublicense for evidence of fraudulent intent. Specifically, although the Barco Sublicense expressly covers all of Belliveau's intellectual property, Section 2.1 purports to acknowledge that Barco holds and has held a preexisting sublicense on this IP since 2008. Belliveau contends this acknowledgement is factually

---

[7] Evidently, Belliveau and ETC reconciled, and he is now listed as a technology contractor for High End.

incorrect and that a jury could find that Barco was dishonest in claiming that it already had an informal, royalty-free license to all of his intellectual property. This is a curious provision, but even assuming that Section 2.1 misstates the facts preceding the Barco Sublicense, Belliveau offers no evidence that Barco included the statement for any dishonest purpose relevant to him. He asserts no way in which the acknowledgement has any bearing on his rights under the High End sublicense. Absent more, the Section 2.1 acknowledgment does not raise a fact issue regarding actual fraud.

Finally, Belliveau urges us to apply the "badges of fraud," which are listed in the Texas Uniform Fraudulent Transfer Act ("TUFTA") to aid in determining fraudulent intent for claims under that statute. Belliveau calls his claim "an IP version of a fraudulent transfer" and relies on *In re Ritz*, in which this court held that "establishing that a transfer is fraudulent under the actual fraud prong of TUFTA is sufficient to satisfy the actual fraud requirement of veil-piercing." 832 F.3d at 567. That TUFTA liability may amount to liability under TBOC § 21.223 does not prove that liability for piercing the corporate veil must depend on TUFTA's statutory formula. Belliveau cites no authority to support that Texas courts look to the badges of fraud outside the TUFTA context (i.e., claims involving a debtor's transfer of property to avoid liability on a debt) to pierce the corporate veil. We do not consider the badges of fraud here.

The evidence, when viewed as a whole, does not raise a fact issue regarding Barco's dishonest purpose or intent to deceive Belliveau in entering into the Barco Sublicense. Piercing the corporate veil is not a cumulative remedy for creditors of corporate or other legal entities in Texas; that theory does not make owners of such entities codefendants for every breach of contract case. It is a remedy to be used when the actions of the entity's owner amounting to "actual fraud" have rendered the entity unable

No. 19-50717

to pay its debts.  The district court properly granted summary judgment on Belliveau's claim to pierce the corporate veil.

## C.  Breach of Fiduciary Duty and Fraud by Nondisclosure

Belliveau also contends that Barco was his fiduciary, and that by entering into the Barco Sublicense and failing to disclose certain information related to that agreement, Barco breached its fiduciary duties and committed fraud by nondisclosure.  The district court granted summary judgment on both claims, reasoning there was no evidence of a fiduciary relationship between Belliveau and Barco.[8]  We agree.

A fiduciary relationship, of course, is a *sine qua non* of a breach of fiduciary duty claim.  *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007).[9]  And "[f]or there to be actionable nondisclosure fraud, there must be a duty to disclose," which arises "when there is a fiduciary relationship."  *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).  Barco does not dispute any of the other elements of Belliveau's breach of fiduciary duty and fraud by nondisclosure claims.  As a result, the sole issue on appeal, common to both claims, is whether there are fact issues as to the existence of a fiduciary relationship between Belliveau and Barco.[10]

---

[8] The district court initially denied Barco's motion for summary judgment on Belliveau's breach of fiduciary duty and fraud by nondisclosure claims, but later reversed course.

[9] Under Texas law, "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant."  *Navigant Consulting, Inc.*, 508 F.3d at 283 (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

[10] Texas courts have held that a duty to disclose may be shown in situations where a fiduciary relationship is lacking.  *See Navigant Consulting, Inc.*, 508 F.3d at 283 (listing

No. 19-50717

A fiduciary relationship may arise either from formal or informal relationships. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, no pet.). "[A] formal fiduciary relationship[] 'arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers.'" *Navigant Consulting*, 508 F.3d at 283 (quoting *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.)). By contrast, an informal fiduciary relationship "may arise where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one." *Id.* "In other words, a fiduciary relationship 'exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 809 (5th Cir. 2017) (quoting *Tex. Bank & Tr. Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)).

Belliveau contends that the record supports two kinds of fiduciary relationships between Belliveau and Barco: one formal (an attorney-client relationship) and one informal (a "confidential" relationship"). Neither argument is persuasive.

First, Belliveau asserts there was an implied attorney-client relationship between himself and Barco's in-house lawyers. "An agreement to form an attorney-client relationship may be implied from the conduct of the parties." *Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265 (Tex. App.—Corpus Christi 1991, writ denied). "But whether the agreement is express or implied, there must be evidence *both* parties intended to create an attorney-

---

four situations). Belliveau, however, relies only on Barco's alleged fiduciary duty in support of his fraud by nondisclosure claim. The assertion of any other theory is therefore waived. *See Hollis*, 827 F.3d at 451.

client relationship—one party's subjective belief is insufficient to raise a question of fact to defeat summary judgment." *Kiger v. Balestri*, 376 S.W.3d 287, 291 (Tex. App.—Dallas 2012, pet. denied) (citing *Valls v. Johanson & Fairless, L.L.P.*, 314 S.W.3d 624, 634 (Tex. App.—Houston [14th Dist.] 2010, no pet.)). In other words, courts "determine whether a[n] [attorney-client] contract can be implied using an objective standard . . . and . . . do not consider [the parties'] unstated, subjective beliefs." *Span Enters. v. Wood*, 274 S.W.3d 854, 858 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

Belliveau alleges that two of Barco's in-house lawyers, Kurt Verheggen and Carolyn Vignery, represented him in sublicensing his intellectual property. In support, Belliveau relies solely on a declaration he submitted in response to Barco's motion for summary judgment.

To begin with, much of the declaration, as it pertains to the existence of a fiduciary relationship, is subjective. Indeed, Belliveau claims he "trusted [Barco's] employees, including its in-house lawyers, to protect my IP interests," and that he believed his discussions with Verheggen and Vignery "to be privileged and confidential discussions with my own lawyers." His subjective belief is not enough to create attorney-client privilege, however. *See LeBlanc v. Lange*, 365 S.W.3d 70, 79 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("One party's subjective belief that such a relationship was formed is not sufficient."); *see also Jacked Up*, 854 F.3d at 808–09 ("[M]ere subjective trust alone is not enough to transform arm's-length dealing into a fiduciary relationship." (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 (Tex. 1992))).

Moreover, most of the declaration excerpts that Belliveau relies on are vague and conclusory. For example, Belliveau represents in his briefing that his declaration states that "Verheggen and Vignery communicated their

agreement to act as Belliveau's personal lawyers in sublicensing his IP." But the declaration does not support that assertion. Rather, the paragraph that Belliveau cites states that "Barco employees, including its in-house lawyers, agreed to act at my direction on matters related to my IP." As the district court held, Belliveau fails to explain what in-house lawyers acted at his discretion, or whether they did so with the intention of representing him in a legal capacity. *See Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013) ("[W]ithout more, a vague or conclusory affidavit is insufficient to create a genuine issue of material fact in the fact of conflicting probative evidence.").

Belliveau also asserts that Verheggen and Vignery "readily communicated with [Belliveau] about his personal IP issues," "kept Belliveau appraised of the details surrounding sublicensing his IP," and "sought Belliveau's input and approval of settlements and sublicenses." Contrary to Belliveau's representations, however, the portions of the declaration Belliveau cites indicate that much of the correspondence regarding Belliveau's sublicensing did not involve attorneys, let alone Verheggen and Vignery.

Finally, to the extent Belliveau's declaration does specifically address interactions with Verheggen and Vignery, his subsequent deposition testimony directly contradicts his assertions. The declaration states that Belliveau "sought and obtained legal advice from Barco's in-house lawyers—specifically Kurt Verheggen and Carolyn Vignery—related to sublicensing my IP . . . . In seeking legal advice from Mr. Verheggen and Ms. Vignery, I gave them confidential information related to my IP . . . ." Even if this statement could be sufficient evidence of an attorney-client relationship, Belliveau testified at his deposition that he could not recall ever directly discussing with Verheggen or Vignery any of the past sublicenses. Belliveau fails to explain this contradiction. *See Copeland v. Wasserstein, Parella & Co., Inc.*, 278 F.3d 472, 482 (5th Cir. 2002) ("[W]hen the sole evidence

purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required an explanation of that conflict."). Summary judgment was appropriate on this claim regarding Belliveau's alleged attorney-client relationship with Barco.

Belliveau argues, in the alternative, that there was an informal confidential relationship between himself and Barco. "Texas law does not recognize a fiduciary relationship lightly, especially in the commercial context." *Jacked Up*, 854 F.3d at 809 (quoting *Lundy*, 260 S.W.3d at 501; *Willis v. Donnelly*, 199 S.W.3d 262, 278 (Tex. 2006)) (internal citations and quotations omitted). "It is well settled that 'not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.'" *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176–77 (Tex. 1997)). Instead, "[t]o impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998).

To show an informal fiduciary relationship, Belliveau alleges, again based on his declaration, that Barco ensured, for almost a decade, that High End met its contractual duty to commercialize Belliveau's IP on reasonable terms, and that Barco involved Belliveau in all sublicensing efforts. But, as the district court found, the 2008 High End License is the basis of Belliveau's suit, and he offers no evidence of a relationship predating that agreement. Indeed, the record suggests that Barco did not enter the picture until 2008, when it purchased all High End's shares. Belliveau has not demonstrated the existence of an informal confidential relationship with Barco.

No. 19-50717

Still, Belliveau contends that the 2017 Barco Sublicense, not the High End License, is the agreement that should be used to measure the existence of a prior relationship. As noted, however, the test is whether the "special relationship of trust and confidence" existed prior to the "agreement *made the basis of the suit.*" *Associated Indem. Corp.*, 964 S.W.2d at 288 (emphasis added). But the agreement that forms the basis of Belliveau's lawsuit is the High End License. After all, Belliveau sued Barco for breach of *that* agreement. Further, even if the court used the Barco Sublicense as the start of the relationship look-back period, Belliveau provides no evidence that his preexisting relationship with Barco consisted of anything more than arms-length transactions commencing with the High End License. The Texas Supreme Court has expressly rejected the use of such interactions to establish a relationship predating the challenged agreement. *See Meyer* 167 S.W.3d at 331 ("These earlier projects were arms-length transactions entered into for the parties' mutual benefit, and thus do not establish a basis for a fiduciary relationship.").[11]

Belliveau reasons that the preexisting relationship rule does not necessarily apply here. Citing *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797 (5th Cir. 2017), and *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), he insists that courts only look to a preexisting relationship when "the plaintiff transacts with the defendant and then claims that the defendant betrayed his trust *in that* transaction." Belliveau correctly distinguishes *Jacked Up* and *Schlumberger* on the facts; both cases involved disputes between litigants over transactions to which they were both parties.

---

[11] *Meyer* also underscored its rejection of an informal fiduciary relationship by pointing out that "the agreements governing the earlier projects expressly disavowed the creation of any fiduciary duties or special relationships." *Id.* at 331; *see also Jacked Up*, 854 F.3d at 809 (same). The High End License contains a nearly identical disclaimer.

By contrast, Belliveau and Barco had no contractual relationship. But this is a commercial case in which Belliveau is attempting to impose a fiduciary duty on Barco based on the parties' business relations. Belliveau's foundational theory of liability is that Barco should be held responsible for High End's contractual obligations. Belliveau can hardly argue that he does not need to show a prior relationship because the parties have no formal contractual relationship.

In sum, Belliveau has not raised a fact issue regarding the existence of an informal fiduciary relationship with Barco. Because Belliveau cannot meet his burden to show a formal or informal fiduciary relationship, the district court properly granted Barco's summary judgment motion on the breach of fiduciary duty and fraud by nondisclosure claims.

### III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is **AFFIRMED**.

No. 19-50717

W. Eugene Davis, *Circuit Judge*, concurring in part and dissenting in part.

I concur in the majority's decision to affirm the summary-judgment dismissal of Belliveau's claims against Barco for breach of fiduciary duty and fraud by nondisclosure. I respectfully dissent, however, from the majority's decision to affirm the summary-judgment dismissal of Belliveau's veil-piercing claim against Barco for High End's breach of contract.

Under the Texas veil-piercing statute, a shareholder (Barco) of a corporation (High End) may be held personally liable for a corporation's obligations if the obligee (Belliveau) demonstrates that the shareholder caused the corporation to be used to perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder. TEX. BUS. ORGS. CODE § 21.223(b). It is undisputed that the fraud alleged here, the Barco Sublicense, gave Barco a direct personal benefit. The remaining question presented, thus, is whether Belliveau came forward with sufficient summary-judgment evidence to create a genuine issue of material fact establishing that Barco used High End to perpetrate an actual fraud on him when it obtained the Barco Sublicense. In my view, and for the following reasons, Belliveau has done so.

Under Rule 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Importantly, "[i]n assessing whether genuine disputes of material fact exist, the court may *not* undertake to evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes." *Matter of Green*, 968 F.3d 516, 520 (5th Cir. 2020) (internal quotation marks and citation omitted) (emphasis added).

This Court has noted that "actual fraud" under the Texas veil-piercing statute involves "dishonesty of purpose or intent to deceive." *In re Ritz*, 832 F.3d 560, 567 (5th Cir. 2016) (internal quotation marks and citations omitted). We have further noted that "[c]ourts may deduce fraudulent intent

from all of the facts and circumstances." *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013). Under Texas law, intent is a "question of fact uniquely within the realm of the trier of fact." *In re Ritz*, 832 F.3d at 569 (internal quotation marks and citations omitted).

Belliveau contends that the following evidence established a genuine issue of material fact regarding Barco's dishonest purpose or deceptive intent in connection with the Barco Sublicense: (1) language in the Barco Sublicense wrongly stating that Barco already had a license to the Licensed IP, free of any royalty, (2) the disparity between the amount Barco paid for the Sublicense and the fair value of the rights obtained, and (3) other facts and circumstances, similar to the "badges of fraud" used for detecting fraudulent transfers, demonstrating Barco's dishonest intent.

As Belliveau contends, the Barco Sublicense states that Barco "has had, since [2008, when it acquired High End], a . . . license, free of any royalty . . . to the Licensed IP" and that it had been operating under an "informal license" to the Licensed IP. There is no evidence in the record supporting this statement. Moreover, the authority for an implied license submitted by Barco after oral argument in response to the Court's questioning does not provide any legal basis for Barco's contention that it had an implied license.[1] The majority acknowledges that the statement in the Barco Sublicense is a "curious provision." The majority submits, however, "even assuming [the provision] misstates the facts," that "absent more" the provision does not raise any fact issue regarding any dishonest purpose on the part of Barco.

---

[1] The authority cited by Barco, *Wommack v. Durham Pecan Co.*, 715 F.2d 962 (5th Cir. 1983), involved the concept of "shop rights," which is when an employer can obtain an implied license to use an employee's invention when the employee makes the invention using the employer's tools and services and during his employment. Belliveau was not an employee of Barco, and the great majority of the IP at issue was developed by Belliveau when he was self-employed.

No. 19-50717

The record, however, does contain "more"—starting with the disparity between Barco's payment of $75,000 and the fair market value of the rights Barco obtained under the Sublicense. The Sublicense itself admits that the $75,000 payment "shall not be deemed to be any indication of, or any precedent for determining, the value of the Licensed IP."[2] The only evidence in the record regarding the fair value of the rights Barco obtained was contained in the expert report submitted by Belliveau. The report determined that the fair market value of the Barco Sublicense was between $93.2 and $356.7 million, drastically more than the $75,000 paid by Barco.

The majority again dismisses this evidence as "not enough" to support Belliveau's veil-piercing claim, but it does so after impermissibly weighing the evidence. Specifically, in an apparent attempt to justify the $75,000 payment, the majority points out that that the Barco Sublicense did not grant Barco the right to sublicense and that Barco agreed not to sell certain competing licensed products for four years, after which the parties would negotiate a mutually agreeable royalty. The majority further submits, noting past sublicenses granted by High End, that the Barco Sublicense "was not the first time High End had sublicensed Belliveau's intellectual property for an arguably small monetary consideration." In my view, however, the majority's analysis simply confirms that there is a genuine issue of material fact regarding whether the consideration Barco paid was grossly inadequate.

The majority also submits that the $75,000 payment required by the Barco Sublicense shows at most that High End breached the provision in the High End License requiring it to "use commercially reasonable efforts to commercialize" Belliveau's IP. A close review of the Barco Sublicense shows that High End did not just grant Barco a license and/or sublicense to Belliveau's IP, but also "unconditionally, fully, and forever, release[d], discharge[d], and covenant[ed] not to sue [Barco] . . . under or related to any

---

[2] There is no evidence explaining the $75,000 payment because High End and Barco have asserted a "common interest" privilege.

Licensed IP . . . on or prior to the Effective Date, and any liability related thereto, regardless of the legal basis or theory of such liability." Therefore, in addition to granting Barco licensing and/or sublicensing rights, High End agreed to give up certain rights it might potentially have against Barco in connection with the Licensed IP.

This provision (which follows the implied license provision discussed above) shows, contrary to the majority's conclusion, that this is more than just a "breach of contract case." Specifically, the majority submits that "this is not a case in which Barco attempted to purloin High End's assets in order to deprive Belliveau of the benefit of his High End License rights." But the provision requiring High End to release any claims it might have against Barco with respect to Belliveau's IP meant that High End is cut off from asserting any claims it might be able to assert against Barco, and, as a result, any additional funds/assets High End might be able to access from Barco in a claim relating to Belliveau's IP.

As Belliveau maintains, there are numerous other facts and circumstances, similar to the "badges of fraud" indicative of fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), demonstrating Barco's dishonest intent in executing the Barco Sublicense. The majority declines to consider the TUFTA badges of fraud because Belliveau cites to no authority showing that Texas courts look to such factors outside of the TUFTA context. However, as noted above, "[c]ourts may deduce fraudulent intent from all of the facts and circumstances." *Spring Street Partners-IV, L.P.*, 730 F.3d at 443.

The badges of fraud constitute facts and circumstances indicative of fraudulent transfers which (like a veil-piercing claim) also require fraudulent intent. Simply because such factors are listed under TUFTA does not mean that such factors are not relevant or that courts are prohibited from reviewing those factors when determining fraudulent intent in other cases. For example, the first factor, whether "the transfer or obligation was to an insider," is directly relevant here, as Barco was the sole shareholder of High

End when the Barco Sublicense was executed. The third factor is also applicable here: "the transfer or obligation was concealed." Belliveau had no knowledge of the Barco Sublicense until Barco raised it as the basis for a counterclaim against Belliveau in this litigation for declaratory judgment of non-infringement. The fourth factor, whether the debtor had been threatened with suit, also applies here. Belliveau had threatened to sue Barco for infringing his IP at the time of the Barco Sublicense.

Based on the foregoing, a jury could reasonably infer that Barco committed actual fraud when it executed the Barco Sublicense with High End. The Barco Sublicense falsely states that Barco had a preexisting "informal license" to the vast array of licensed patents and licensed technology developed by Belliveau and covered by the High End License. And to avoid any doubt regarding the implied license, High End agreed to release Barco from any liability related to the Licensed IP. This release conveniently occurred after Belliveau threatened to sue Barco for infringement. Furthermore, the Barco Sublicense granted Barco a formal license/sublicense to High End's and Belliveau's patent portfolio, as well as Belliveau's future IP. For all of this, Barco paid High End $75,000, of which Belliveau is entitled to half. Belliveau's expert report, which is the only valuation evidence in the record, opines that Barco should have paid between $93.2 and $356.7 million for a license to this valuable IP. Based on this competent summary-judgment evidence, a jury could find that the price paid by Barco, and the amount Belliveau would receive, was grossly inadequate.

The Barco Sublicense was confected between High End and its sole shareholder, Barco. This was clearly an "inside" deal, executed in the middle of negotiations between Barco and ETC. Barco subsequently sold all of its shares in High End to ETC. A jury could infer that the Barco Sublicense played a part in persuading ETC to close the deal.

Mr. Belliveau deserves to have a jury decide all of these fact issues. Therefore, I respectfully dissent.