# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00260-CV

**Plan B Holdings, LLC; CIPE Real Estate Solutions, LLC; and Cheryl Cox, Appellants**

**v.**

**RSLLP, f/k/a Reed & Scardino LLP, Appellee**

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-17-002555, THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING

## O P I N I O N

RSLLP, f/k/a Reed & Scardino LLP ("the Firm"), a law firm, sued Plan B Holdings, LLC and CIPE Real Estate Solutions, LLC, as well as the owner of those two companies, Cheryl Cox, for unpaid attorney's fees. The Firm's petition alleged claims of sworn account, breach of contract, and quantum meruit against all defendants and further alleged a claim of alter ego— piercing the corporate veil—against Cox individually. By a pretrial order, the trial court assessed $2,500 sanctions against Cox for discovery abuse. After a non-jury trial, the trial court rendered judgment that the Firm recover from all defendants, jointly and severally, actual damages for the unpaid fees in the amount of $83,509.63, attorney's fees and expenses in the amount of $117,689.64, and post-judgment interest. The judgment did not attribute the recovery to any particular theory or cause of action. Cox and the companies perfected this appeal. They argue that (1) as limited liability companies, Plan B and CIPE are not liable for attorney's fees under Section 38.001 of the Texas Civil Practice and Remedies Code; (2) Cox is not liable for damages

under theories of sworn account, breach of contract, and quantum meruit because she was not individually a client of the Firm's; (3) the evidence is insufficient to find Cox individually liable for damages under a theory of piercing the corporate veil; and (4) the trial court abused its discretion in assessing sanctions against Cox for discovery abuse. We will affirm in part and reverse and render in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to engagement letters, the Firm performed legal services for Plan B and CIPE, two limited liability companies owned by Cox. The Firm argues that pursuant to those same engagement letters, its legal services were also performed for Cox individually. These services included (1) defending the companies against a lawsuit brought by a different plaintiff, Sense Corp., to recover fees for services, (2) obtaining a patent for Plan B, and (3) obtaining two trademarks and a copyright for Epic Real Estate Solutions, a company owned by Cox but not part of this appeal.

In 2012 Cox had the idea for a product she called "TitleClose," which was to be used in connection with e-closings of real estate transactions. In April 2012 she engaged the Firm to represent Epic in obtaining two trademarks and a copyright to be used in connection with the TitleClose online platform.

To get the TitleClose product running, Cox located a Missouri company, Sense Corp., to develop a real estate platform, i.e., a software package. Because she was going to be selling Epic in the near future, she had CIPE enter into the contract with Sense. A billing dispute thereafter arose between CIPE and Sense. In October 2014 Sense sent a demand letter to CIPE for approximately $335,000 in unpaid invoices. The Firm was then separately engaged to represent

2

CIPE in this dispute. Shortly thereafter the Firm was engaged to represent Plan B in obtaining a patent for the TitleClose product.

In December 2014 Sense sued CIPE for its unpaid invoices. Sense's petition alleged that "[u]ntil CIPE's obligations under the Contract are met, ownership of the Products ha[s] not vested with CIPE and Plaintiff retains all ownership and title to the Products." Two months later Cox registered Plan B to do business in Texas. The "Fictitious Name"—d/b/a—listed on the registration form for Plan B was "Shop TitleClose LLC."

During 2015 the Firm performed work on the Sense lawsuit as well as the patent, trademark, and copyright applications. In October 2015 Sense added Plan B and Epic Real Estate as defendants in the lawsuit. In December 2015 the companies settled the Sense lawsuit for $185,000. The money for the settlement was borrowed from another of Cox's companies.

At some point in 2015, Cox's companies stopped paying the Firm's invoices, which were sent to Cox monthly. Cox testified that she first became aware of past-due invoices when, in November 2016, the Firm sent her an email with a more urgent tone. She testified that the unpaid bills had been overlooked because she and her staff had been overwhelmed by the process of selling one or more of her companies. Nonetheless, Cox thereafter disputed some of the invoices. At this point, the TitleClose product was primarily under the control of Plan B.

Shortly after learning of her companies' past-due debt to the Firm, Cox formed a new corporation, Yellow Frame, Inc., of which she owns 55%. Cox met with members of the Firm in January 2017 to see if the issue of the overdue bills could be resolved. The meeting was unsuccessful, and a month later Cox registered Yellow Frame to do business in Texas. Yellow Frame later took over the use and marketing of TitleClose and by the time of trial was reaping the profits from the product.

In June 2017 the Firm filed suit against Plan B, CIPE, and Cox for its unpaid invoices. The unpaid bills related to the work that the Firm had done on the Sense lawsuit as well as the trademark, copyright, and patent applications. At the time of trial, Cox still owned the TitleClose trademark and was, through Yellow Frame, still using the TitleClose trademark and platform as her business. While Yellow Frame was making a profit from the TitleClose product, Plan B and CIPE were insolvent.

After a non-jury trial, the trial court rendered judgment that the Firm recover from all defendants, jointly and severally, actual damages of $83,509.63, attorney's fees and expenses in the amount of $117,689.64, and post-judgment interest. Cox and the companies appeal.

## DISCUSSION

### The Companies' Appellate Issue

#### *Attorney's Fees Against the Companies*

Appellants do not challenge the award of actual damages against CIPE and Plan B. They do, however, complain of the trial court's award of attorney's fees against those entities. It is undisputed that CIPE and Plan B were limited liability companies (LLCs). Appellants assert that an award of attorney's fees against the LLCs was improper under the circumstances of this case.

Under the "American Rule," which is followed in Texas, litigants may recover attorney's fees only if specifically provided for by contract or statute. *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011); *Benge v. Thomas*, No. 13-18-00619-CV, 2020 WL 5054800, at *16 (Tex. App.—Corpus Christi–Edinburg Aug. 27, 2020, no pet.) (mem. op.). The Firm does not

4

assert that any contract between the parties provided for a recovery of attorney's fees, so the award of attorney's fees here must have a statutory foundation.

The Firm sought attorney's fees solely pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code. As currently worded, that section provides that for certain types of claims, including rendered services, a sworn account, and an oral or written contract, attorney's fees may be recovered from

> an individual or organization other than a quasi-governmental entity authorized to perform a function by state law, a religious organization, a charitable organization, or a charitable trust, in addition to the amount of a valid claim and costs[.]

Tex. Civ. Prac. & Rem. Code § 38.001(b). LLCs fit within the definition of "organization." *See id.* § 38.001(a); Tex. Bus. Org. Code § 1.002.

The foregoing language, however, has been part of Section 38.001 only since September 1, 2021. Before that date, the statute allowed for the recovery of attorney's fees only from "an individual or corporation." Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, sec. 38.001, 1985 Tex. Gen. Laws 3242, 3278. Suits filed before September 1, 2021, are governed by the prior language.[1] Because the present case was filed on June 8, 2017, the older statutory language governs this case.

---

[1] The bill that amended Section 38.001 in 2021 recites:

> The change in law made by this Act applies only to an award of attorney's fees in an action commenced on or after the effective date of this Act. An award of attorney's fees in an action commenced before the effective date of this Act is governed by the law applicable to the award immediately before the effective date of this Act, and that law is continued in effect for that purpose.

Act of May 28, 2021, 87th Leg., R.S., ch. 665, § 2, 2021 Tex. Gen. Laws 1391, 1391.

Texas cases construing the older version of Section 38.001 have uniformly held that attorney's fees are not allowed against LLCs under that statutory language. *See Benge Gen. Contracting, LLC v. Hertz Elec., LLC*, No. 05-19-01506-CV, 2021 WL 5317840, at *3–4 (Tex. App.—Dallas Nov. 16, 2021, no pet.) (mem. op.) ("Under the plain language of section 38.001, a trial court cannot order limited liability partnerships (LLP), limited liability companies (LLC), or limited partnerships (LP) to pay attorney's fees."); *Spicer v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 128–29 (Tex. App.—Fort Worth 2020, no pet.) ("Convinced by our sister courts' reasoning, we hold that an LLC is not liable for attorney's fees under Section 38.001 . . . .") (collecting cases).

Accordingly, the trial court erred in awarding attorney's fees against CIPE and Plan B.[2]

---

[2] In its Appellee's Brief, the Firm asserted that Appellants did not preserve this error for appeal. The reporter's record indicates that during a post-trial hearing on a motion to enter judgment, conducted via Zoom, Appellants' attorney made an objection that was recorded by the court reporter as "inaudible zoom." The reporter's record does recite that the trial court overruled the inaudible objection. Appellants' attorney filed an affidavit in which he averred that during the portion of the hearing recorded as "inaudible zoom" he had in fact argued that it was not legally permissible to award attorney's fees against CIPE and Plan B because they were LLCs. This Court abated the appeal and remanded the case to the trial court for a determination whether Appellants' attorney had "adequately brought to the court's attention the argument that Section 38.001 of the Civil Practice & Remedies Code does not permit the award of attorney's fees against limited liability companies." Following a hearing, the trial court signed an order stating that the argument had been adequately brought to the court's attention. Accordingly, we hold that Appellants preserved this error for appeal. *Cf. Guillory v. Dietrich*, 598 S.W.3d 284, 301 (Tex. App.—Dallas 2020, pet. denied) (error preserved by closing argument and post-trial filings).

**Cox's Appellate Issues**

### *Sanctions Award Against Cox*

In their first issue, Appellants complain that the trial court erred in assessing monetary sanctions against Cox for her failure to appear for her scheduled deposition. The appellate record shows that in July 2019 the parties agreed to have Cox deposed on November 9 at her attorney's office in Austin. The day before the deposition was to be taken, the Firm was informed that Cox would not appear in person for her deposition but instead would be appearing via "Skype" from Dallas. The Firm's attorney indicated that this was not acceptable.

The next day, the scheduled deposition date, the attorney for the Firm appeared at Cox's attorney's office, as did the court reporter the Firm had hired to transcribe the deposition. Cox's attorney also appeared, but Cox did not. As presaged the day before, Cox called her attorney's office via Skype. Cox claimed to have the ability to be sworn, but the proceeding never got that far. The court reporter subsequently prepared a Certificate of Non-Appearance documenting that Cox had not appeared in person.

The Firm later filed a motion seeking discovery sanctions for Cox's failure to appear. The primary sanction sought by the motion was the amount of attorney's fees, costs, and expenses the Firm incurred due to Cox's failure to appear. The motion was accompanied by an affidavit detailing such fees, costs, and expenses, which totaled more than $6,000.

Cox filed a sworn pro se response to the Firm's sanctions motion. In it she stated that following a mediation in Austin the day before the scheduled deposition she told her attorney she wanted to attend the deposition via video because she had "an appointment in Dallas the next day." This was conveyed to the Firm's attorney, who did not agree to this change. Cox averred that she then decided to stay in Austin and attend the deposition in person after all, but that shortly

7

thereafter her attorney told her that he wanted to resign from the case. Cox then told the Firm's attorney that she did not feel she had "proper representation to proceed" with the deposition and would not appear in person. Cox's attorney did in fact move to withdraw from representing Cox, but that did not occur until a later date.

The trial court granted the Firm's motion for monetary sanctions, ordering Cox to pay $2,500 to the Firm for "reasonable and necessary attorneys' fees and court reporter expenses." In its order, the court found "a direct relationship between the offensive conduct and the sanction" and that the sanction was "no more severe than necessary to promote full compliance with the discovery process."

A sanctions award under Rule 215 of the Texas Rules of Civil Procedure is reviewed for abuse of discretion. *Medina v. Zuniga*, 593 S.W.3d 238, 244 (Tex. 2019). A trial court abuses its discretion if it acts without reference to any guiding rules or principles, and its judgment should be reversed only if the ruling was arbitrary or unreasonable. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 884 (Tex. 2017).

A sanctions award must further one of the recognized purposes of discovery sanctions: (1) secure the parties' compliance with the rules of discovery; (2) deter other litigants from violating the discovery rules; and (3) punish parties that violate the rules of discovery; it also may be used to rectify discovery abuse by compensating the aggrieved party for expenses incurred. *Id.*; *see also* Tex. R. Civ. P. 215.2(b)(8). Further, the sanctions must be "just," i.e., no more severe than required to further their legitimate purposes, and specifically related to the harm done by the condemned conduct. *Horizon Health*, 520 S.W.3d at 884.

We reject Cox's arguments regarding the sanctions award. First, she did not lack representation at the deposition. Until a motion to withdraw is granted by a court, an attorney

8

continues to owe his client the full panoply of duties encompassed in the attorney-client relationship. *See, e.g.*, *Reyes v. State*, 557 S.W.3d 624, 640 (Tex. App.—El Paso 2017, pet. ref'd) ("The filing of the motion to withdraw only signals counsel's desire to be released from his obligation to represent his client, and not that the attorney has actually ended the representation. Only the trial court by granting the motion can actually end the attorney's on-going obligations to the client."); *Stephens v. Hale*, No. 06-98-00101-CV, 1999 WL 1217878, at *5 (Tex. App.—Texarkana Dec. 21, 1999, pet. denied) (not designated for publication) ("Attorneys are considered officers of the court, and once having appeared as attorneys of record for a party, they continue as the attorneys of record until the trial court gives them permission to withdraw."); *Hall v. Fulbright & Jaworski, L.L.P.*, No. 05-95-00488-CV, 1996 WL 87211, at *2 (Tex. App.—Dallas Feb. 29, 1996, no writ) (not designated for publication) ("As long as the attorney-client relationship continues, these duties [owed by the attorney] exist.").

Second, the venue for the deposition was her own attorney's office in Austin, and he appeared at the deposition on her behalf.

Next, her excuse that she did not feel she had "proper representation" to proceed does not hold water. She expressed a willingness to proceed with the deposition by Skype, but she would have had no greater representation through that medium—arguably less—than if she had appeared in person. With her attorney present at the deposition site, the only difference was that she was in Dallas instead of Austin. That does not constitute lacking proper legal representation.

Finally, the record confirms that the sanctions ordered by the trial court were "just," were no more severe than required to further their legitimate purposes, and were specifically related to the harm done by the condemned conduct.

We hold that the trial court did not abuse its discretion in issuing its sanctions order and therefore overrule Cox's complaint as to that portion of the Final Judgment.[3]

Appellants next challenge the legal sufficiency of the evidence to support the portion of the trial court's judgment holding her jointly and severally liable for the actual damages sustained by the Firm.[4]

### Breach of Contract

Cox challenges the trial court's award of damages against her individually to the extent the award was based on a breach-of-contract theory. Cox argues that she signed the

---

[3] The interlocutory sanctions order merged into the final judgment. *See Gutierrez v. Lorenz*, No. 14-18-00608-CV, 2020 WL 1951606, at *7 (Tex. App.—Houston [14th Dist.] Apr. 23, 2020, no pet.) (mem. op.) ("The sanctions order was an interlocutory order, which merged into the final judgment.").

[4] A single sentence in the Appellants' Brief states that "the evidence was factually and legally insufficient" to support Cox's individual liability under any of the theories asserted by the Firm. This statement appears at first blush to raise both legal and factual sufficiency of the evidence. However, Appellants' Brief neither specifically argues factual insufficiency nor sets forth the standard of review for factual sufficiency. Perhaps most important, the prayer for relief at the conclusion of the Appellants' Brief does not ask for a remand for new trial but only that this Court "reverse the judgment to the extent it imposes liability and assesses damages and attorney's fees and costs against Cox and render that the Firm take nothing on its claims against her." We hold that Appellants have raised only a legal-sufficiency challenge to the trial court's judgment. *See City of Univ. Park v. Van Doren*, 65 S.W.3d 240, 246 (Tex. App.—Dallas 2001, pet. denied) (holding that appellant's brief, although containing reference to "great weight and preponderance of the evidence," raised only legal-sufficiency challenge where appellant did not argue factual sufficiency, did not set forth standard of review for factual sufficiency, and brief's prayer for relief asked only for rendition of judgment); *see also Paxton v. City of Austin*, No. 03-19-00501-CV, 2021 WL 3085845, at *6 n.5 (Tex. App.—Austin July 22, 2021, pet. denied) (mem. op.) ("Because [appellant], on this issue, does not request a remand . . . we construe his challenge as a legal sufficiency challenge."); *State v. Approximately $110,540.00*, No. 14-18-00360-CV, 2019 WL 4071923, at *1 n.1 (Tex. App.—Houston [14th Dist.] Aug. 29, 2019, no pet.) (mem. op.) (where appellant did not provide distinct factual-sufficiency analysis, contended that judgment was "conclusively establish[ed]," and asked only for rendition of a judgment in its favor, court held that "the State's issue presents solely a legal-sufficiency challenge, not a factual-sufficiency challenge.").

agreements with the Firm in a representative capacity and therefore was not a party to those agreements, i.e., that no valid contract exists between her individually and the Firm. *See Shank, Irwin, Conant & Williamson v. Durant, Mankoff, Davis, Wolens & Francis*, 748 S.W.2d 494, 499 (Tex. App.—Dallas 1988, no writ) ("[U]nless the parties have agreed otherwise, a person making a contract with another as an agent for a disclosed principal is *not* a party to the contract and is not obligated on the contract.").

"Breach of contract requires pleading and proof that (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). "In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)).

As described above, the Firm entered into contracts, through engagement letters, to do work for CIPE and Plan B. *See Bayoud v. Shank, Irwin & Conant*, 774 S.W.2d 22, 24 (Tex. App.—Dallas 1989, no writ) ("[A] law firm's engagement letter is the controlling contract when a dispute arises over attorney's fees."). The bodies of the engagement letters contained the following paragraphs, identical in each except for the name of the company:

[The CIPE engagement letter:]

**<u>CLIENT AND SCOPE OF REPRESENTATION.</u>** *In this engagement, our representation is solely of CIPE Real Estate Solutions, LLC. Our engagement is limited to the matter described above and if we agree to perform additional legal*

11

services, this letter will apply to such services. *Unless specifically agreed to by us in a letter like this one, we will not be representing other related persons or entities, including any subsidiaries, affiliates or shareholders.* In addition, we will provide only legal advice and services, and not financial, accounting, business or other advisory services.

(Emphasis added.)

[The Plan B engagement letter:]

***CLIENT AND SCOPE OF REPRESENTATION.*** *In this engagement, our representation is solely of Plan B Holdings LLC.* Our engagement is limited to the matter described above and if we agree to perform additional legal services, this letter will apply to such services. *Unless specifically agreed to by us in a letter like this one, we will not be representing other related persons or entities, including any subsidiaries, affiliates or shareholders.* In addition, we will provide only legal advice and services, and not financial, accounting, business or other advisory services.

(Emphasis added.)

Cox signed those engagement letters as follows, respectively:

[The CIPE engagement letter:]

/s/ Cheryl Cox
CIPE Real Estate Solutions, LLC
By: Cheryl Cox

[The Plan B engagement letter:]

/s/ Cheryl Cox
Plan B Holdings, LLC
By: Cheryl Cox

Cox contends she signed the engagement letters solely as a representative of CIPE and Plan B and therefore cannot be held liable in her individual capacity. The Firm takes the contrary view.

●*The Signature Blocks*

In the present case, the signature blocks in the engagement letters—each containing the name of the company and "By Cheryl Cox"—indicate that Cox was signing as the representative of, and on behalf of, the named company:

> Under Texas law, the use of the word "By" before Hsu's signature indicates that he signed as an agent of Midland, not individually. . . .
>
> . . . .
>
> . . . . [W]hen he signed the Agreement, he disclosed his representative capacity and identified his true principal.  He signed the Agreement under the designation "BUYER" and did so "By: Pochin M. Hsu."  In such circumstances, the signer is not personally liable.

*AFD Fund v. Midland Mgmt., LLC*, No. CIV.A.3:02CV0055-D, 2002 WL 731813, at *5–6 (N.D. Tex. Apr. 22, 2002) (citing *Federal Deposit Ins. Corp. v. K-D Leasing Co.*, 743 S.W.2d 774, 776 (Tex. App.—El Paso 1988, no writ), and *Priest v. First Mortg. Co.*, 659 S.W.2d 869, 871–72 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.)).

●*The Bodies of the Contracts Created by the Engagement Letters*

The engagement letters, quoted above, expressly provide that "[i]n this engagement, our representation is solely of CIPE Real Estate Solutions, LLC [or Plan B Holdings, LLC]."  That same paragraph in each agreement goes on to state that "[u]nless specifically agreed to by us in a letter like this one, we will not be representing other related persons or entities, including any subsidiaries, affiliates or shareholders."  It is undisputed that Cox was the sole owner and shareholder of CIPE and Plan B.

The Firm argues that Cox was a party to the engagement-letter contracts because, notwithstanding the portions quoted above, they were sent by email to "Cheryl Cox, Plan B

13

Holdings, LLC" (or Cheryl Cox, CIPE Real Estate Solutions, LLC) and were addressed "Dear Ms. Cox." In addition, the engagement letters frequently referred to "you" in the body of the agreements.

● *The Signature Blocks and Bodies of the Engagement Letters Together*

In deciding whether an agent is personally liable on a contract the agent signed, both the signature and the body of the contract should be considered. *See Chaiken v. Boyd*, No. 05-95-00375-CV, 1996 WL 18810, at *2 (Tex. App.—Dallas Jan. 18, 1996, no writ) (not designated for publication) ("In determining whether an instrument discloses representative capacity on its face, we review the entire instrument, not just the signature block."); *AFD Fund*, 2002 WL 731813, at *6 (citing and quoting *Chaiken*).

Indeed, the body of the contract may be controlling. Texas courts have long held that a signatory will not be held personally liable where the body of the contract indicates that the signature was in a representative capacity:

> "It is . . . the rule that where, in the body of the contract, it purports to be a contract of the corporation, the signature of the name of the officer with or without an affix designating his representative capacity does not render it his personal contract." 19 Am. Jur.2d 752, Corporations [§] 1346.

> "As long as a corporate contract is signed by the necessary or proper officers or agents, in the absence of a statutory, charter, or by-law provision to the contrary, no particular form of signature is required, provided it is apparent that it is the corporation's contract and not the individual undertaking of its agent." 19 C.J.S . Corporations [§] 1138, pp. 707–708.

*Robertson v. Bland*, 517 S.W.2d 676, 678 (Tex. App.—Houston [1st Dist.] 1974, writ dism'd); *see also Star Supply Co. v. Jones*, 665 S.W.2d 194, 198 (Tex. App.—San Antonio 1984, no writ) ("The signature of a corporate officer on a contract does not render it his personal contract, where in the

14

body of the contract, it is purported to be a corporation contract."); *accord Kaheel Props., LLC v. Azteca Ent. Enters., Inc.*, No. 11-16-00137-CV, 2018 WL 2976357, at *4 (Tex. App.—Eastland June 14, 2018, no pet.) (mem. op.); *Freeman v. Harleton Oil & Gas, Inc.*, 528 S.W.3d 708, 748–49 (Tex. App.—Texarkana 2017, pet. denied); *Pabich v. Kellar*, 71 S.W.3d 500, 508 (Tex. App.—Fort Worth 2002, pet. denied).

The foregoing Texas cases are consistent with the Restatement (Second) of Agency § 156, which states:

> In the absence of a manifestation to the contrary therein, an unsealed written instrument is interpreted as the instrument of the principal and not of the agent if, in the signature or description of the parties, the name of the principal and agent both appear, the agent indicating his agency.

Restatement (Second) of Agency § 156 (Am. L. Inst. 1958). Comment *a* to Section 156 seeks to elucidate this rule by stating that the principal's name followed by the agent's name preceded by a preposition such as "by" or "per" will, "in the absence of a contrary manifestation in the document," create an inference that the principal and not the agent is a party. *Id.* at cmt. a. According to this Comment, the signatory's name preceded by a word such as "By" will create only an *inference* of agency. Even if the "inference" standard contained in Comment *a* embodies Texas law, however, the express terms of Section 156 dictates that such a standard applies only "[i]n the absence of a manifestation to the contrary therein."

Section 320 of the same Restatement provides that an agent who signs for a disclosed principal is not a party to the agreement unless the agent expressly agrees to become a party: "Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." Restatement (Second) of Agency § 320 (Am. L. Inst. 1958). Comment *a* to section 320 explains as follows:

15

One who purports to contract on behalf of a designated person does not manifest by this that he is making a contract on his own account, and only where he so manifests does the agent become a party to a contract which he makes for the principal. In the absence of other facts, the inference is that the parties have agreed that the principal is, and the agent is not, a party. This is true although the agent uses such an expression as, "I will sell."

*Id.* at cmt. *a*. Comment *a* explains that this section creates an inference that the agent is not a party to the contract. As with section 156, however, this rule of "inference" only applies "in the absence of other facts." Here, "other facts" exist within the contracts showing a clear intent.

Texas cases have consistently followed these standards in holding that a person who signs a contract on behalf of a disclosed principal is not a party to the contract and is generally not liable under it. *See, e.g.*, *Roe v. Ladymon*, 318 S.W.3d 502, 521 (Tex. App.—Dallas 2010, no pet.) ("[B]y signing the contract as an agent for a disclosed principal, Ladymon did not become personally bound by the terms of that contract . . . ."); *Nadeau Painting Specialist, Ltd. v. Dalcor Prop. Mgmt., Inc.*, No. 03-06-00060-CV, 2008 WL 2777724, at *6 (Tex. App.—Austin July 18, 2008, no pet.) (mem. op.) ("Unless the parties have agreed otherwise, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." (quoting *A to Z Rental Ctr. v. Burris*, 714 S.W.2d 433, 435 (Tex. App.—Austin 1986, writ ref'd n.r.e.)); *see also Mission Grove, L.P. v. Hall*, 503 S.W.3d 546, 551–52 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("As a general rule, a suit for breach of contract may not be maintained against a person who is not a party to the contract . . . .")..[5]

---

[5] There are limited circumstances under which a nonparty to a contract may nonetheless be bound by it, *see, e.g.*, *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 & n.15 (Tex. 2005) (orig. proceeding); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding), but the only legal principle for such a result that the Firm has raised is an alter-ego theory, which we discuss below.

In the present case, the signature box alone provides strong, if not controlling, proof that Cox signed only in a representative capacity. And the engagement letters not only show that the companies—CIPE and Plan B—were the only *named* parties to the contract, they expressly state that they were the *only* parties to it: "In this engagement, our representation is solely of CIPE Real Estate Solutions, LLC [or Plan B Holdings, LLC]." Even more, the engagement letters expressly list who are *not* parties to the agreement: "Unless specifically agreed to by us in a letter like this one, we will not be representing other related persons or entities, including any subsidiaries, affiliates or shareholders." It is undisputed that Cox was the sole owner and shareholder of CIPE and Plan B.

That the engagement letters were addressed "Dear Ms. Cox" is no evidence that she was intended to be a party to the agreement. It is to be expected that a proposed contract will be addressed to an individual, and Cox, as the owner of the companies, was the logical recipient. Nor do we believe the engagement letters' boilerplate use of the term "you" overcomes the explicit recitations of who is and is not a party to the agreements. The Firm concedes that the engagement letters were "standard form engagement agreements" drafted by the Firm.

Considering the signature blocks and the bodies of the agreements together convinces us that, under long-established Texas law, the record contains no more than a scintilla of evidence that the parties intended for Cox to be individually liable under the engagement letters. For the foregoing reasons, we hold that the Firm could not recover from Cox under a breach-of-contract theory, and we sustain Appellants' complaint as to that claim.

### Sworn Account

Appellants also complain of the judgment to the extent it awarded damages against Cox based on the Firm's sworn-account claim.

"[A] suit on a sworn account is not an independent cause of action but is an expedited method for proving a certain type of breach of contract claim." *Syed v. Weathershield Sols., LLC*, No. 14-18-01104-CV, 2020 WL 4970827, at *2 (Tex. App.—Houston [14th Dist.] Aug. 25, 2020, no pet.) (mem. op.) (citing *Rizk v. Financial Guardian Ins. Agency, Inc.*, 584 S.W.2d 860, 862 (Tex. 1979), and *Southern Mgmt. Servs., Inc. v. SM Energy Co.*, 398 S.W.3d 350, 353 (Tex. App.—Houston [14th Dist.] 2013, no pet.)). Accordingly, because we have held that the Firm's breach-of-contract claim fails against Cox, its sworn-account claim necessarily fails as well. We sustain Appellants' complaint as to that claim.

### Quantum Meruit

Appellants next challenge the trial court's judgment to the extent it awarded damages against Cox on the basis of the Firm's quantum-meruit claim. "Quantum meruit is an equitable remedy that is 'based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.'" *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018) (quoting *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (orig. proceeding)).

The elements of a quantum-meruit cause of action are well established:

> To recover under a quantum-meruit claim, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or

18

furnishing such materials was expecting to be paid by the person sought to be charged.

*Id.* at 732–33. In addition, it is well settled that "[a] party generally cannot recover under a quantum meruit claim when there is a valid contract covering the services or materials furnished." *Id.* at 733.

In the present case, these rules present at least three insurmountable hurdles for the Firm. First, valid contracts covering the services furnished did exist. As discussed above, the engagement letters between the Firm and the two LLCs—CIPE and Plan B—covered precisely the services for which the Firm sought to recover from Cox individually through its quantum-meruit claim.

Second, the fourth element of a cause of action for quantum meruit stated above is that the person sought to be charged (Cox) was reasonably notified that the plaintiff performing such services (the Firm) was expecting to be paid by the person sought to be charged. As discussed above, we have held that Cox was not a party to the contracts with the Firm represented by the engagement letters and did not agree by her signatures thereon to be personally liable for the Firm's fees. In addition, many of the Firm's invoices were addressed to "CIPE Real Estate Solutions, LLC" or "Plan B Holdings, LLC." The fact that some invoices were addressed to "CIPE Real Estate Solutions, LLC c/o Cheryl Cox" or "Plan B Holdings, LLC Cheryl Cox" is no evidence that she was thereby notified that the Firm expected payment from her individually as opposed to payment from the companies. Accordingly, the record contains no more than a scintilla of evidence that Cox was reasonably notified that the Firm was expecting her to pay for the Firm's services.

Finally, the third element of a quantum-meruit claim is that the services must have been rendered "for the person sought to be charged." *Id.* at 73233. Under this element, more must be shown than that the person sought to be charged benefited from the services:

> Truly . . . was not rendering services for the defendants, Austin and Clark. Instead, pursuant to the joint venture agreement, he performed his services for the joint venture. To recover in quantum meruit, the plaintiff must show that his efforts were undertaken for the person sought to be charged; *it is not enough to merely show that his efforts benefitted the defendant*.

*Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988) (emphasis added); *accord MetroplexCore, L.L.C. v. Parsons Transp., Inc.*, 743 F.3d 964, 975 (5th Cir. 2014). Here, Cox certainly benefited from the Firm's work, but the sole owner of any company benefits from work done for the company.

For the foregoing reasons, we hold the Firm could not recover from Cox under a quantum-meruit theory, and we sustain Appellants' complaint as to that claim.

### Piercing the Corporate Veil

Finally, Appellants argue that the evidence in the record was legally insufficient to support the trial court's imposition of personal liability against Cox for the companies' debts under a theory of "alter ego," which is one theory for "piercing the corporate veil." Under that theory, an owner of a corporation or limited liability company can, in limited circumstances, be held personally liable for the debts of the business entity.

In general, an owner or officer of a corporation is not liable for corporate debts:

> A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations. Avoidance of personal liability is not only sanctioned by

20

the law; it is an essential reason that entrepreneurs like [the appellant] choose to incorporate their businesses.

*Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006); *accord U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 212 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting *Willis*).

In Texas, the ability of a corporate or LLC creditor to "pierce the corporate veil" and impose individual liability on an owner for a company's contractual obligations is expressly limited by statute:

> A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:
>
> . . . .
>
> (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory. . . .

Tex. Bus. Orgs. Code § 21.223(a)(2). There is, however, a statutory exception that allows individual liability to be imposed "when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451–52 (Tex. 2008) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex.1986)). The statutory exception reads as follows:

> Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

Tex. Bus. Orgs. Code § 21.223(b). Both the restriction on individual liability and the exception to it likewise apply to limited liability companies. *See id.* § 101.002(a) ("Subject to Section 101.114, Section[] 21.223 . . . appl[ies] to a limited liability company and the company's members, owners, assignees, affiliates, and subscribers.").

The history behind these statutory provisions has been detailed in other court opinions and will not be repeated here. *See, e.g.*, *TecLogistics, Inc. v. Dresser-Rand Grp., Inc.*, 527 S.W.3d 589, 599–600 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 442–44 (5th Cir. 2013).

"[I]n the context of piercing the corporate veil, actual fraud is not equivalent to the tort of fraud." *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.); *accord HHH Farms, L.L.C. v. Fannin Bank*, 648 S.W.3d 387, 409 (Tex. App.—Texarkana 2022, pet. denied); *Belliveau v. Barco, Inc.*, 987 F.3d 122, 129 (5th Cir. 2021). Rather, as the Texas Supreme Court stated in *Castleberry*, "[a]ctual fraud usually involves dishonesty of purpose or intent to deceive . . . ." *Castleberry*, 721 S.W.2d at 273 (quoting *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)). Texas appellate courts have since coalesced around that definition of "actual fraud" for purposes of piercing the corporate veil. *See, e.g.*, *HHH Farms*, 648 S.W.3d at 409; *Mungas v. Odyssey Space Rsch., LLC*, No. 14-19-00378-CV, 2021 WL 3416500, at *4 (Tex. App.—Houston [14th Dist.] Aug. 5, 2021, no pet.) (mem. op.); *R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits, Inc.*, 578 S.W.3d 218, 231 (Tex. App.—El Paso 2019, no pet.); *U.S. KingKing, LLC*, 555 S.W.3d at 212–13.

With this summary of Texas law regarding piercing the corporate veil, we will examine the record for evidence of "actual fraud" by Cox.

In her career, Cox held senior roles in various title and real estate insurance companies. In approximately 2010, the company she was working for went out of business, effectively forcing her to become an entrepreneur in residential real estate. Cox purchased Epic Real Estate Solutions, Inc., which had been incorporated in 2009. Epic was a national title agency licensed in 32 states as a title insurance agency. Soon thereafter she incorporated a start-up company called CIPE Real Estate Solutions, of which she was the sole owner. In late 2011 she created another start-up company, a Delaware company called Plan B Holdings, LLC. She used another company, Epic Management Company, as a "shared-resource manager" to assist in managing her several businesses.

In early 2012, Cox got the idea to create an online product that would assist lenders, buyers, and title companies in accomplishing "e-closings." She called her proposed product "TitleClose." In April 2012 the Firm was engaged to represent Epic in obtaining two trademarks and a copyright, all to be used in connection with the TitleClose online platform. The trademarks related to such things as a logo for the TitleClose product. The copyright was for the TitleClose source code. To get the TitleClose product running, Cox chose Sense Corp., a Missouri company, to develop an online platform TitleClose. Cox had CIPE, rather than Epic Real Estate, sign a contract with Sense because she was going to be selling Epic.

After a period of time, a billing dispute arose between CIPE and Sense because CIPE had stopped paying Sense's invoices. Cox questioned the quality of Sense's work. On October 2, 2014, Sense sent a demand letter to CIPE for unpaid fees, which amounted to approximately $335,000. In its demand letter, Sense asserted that until full payment was made CIPE forfeited any ownership interest it might otherwise have had in the work product provided by Sense. Apparently Sense's work was almost completed at that point, and Sense had already

23

provided CIPE with a substantial amount of the finished product. Six days after receiving Sense's demand letter, Cox engaged the Firm to represent CIPE in that dispute.

A month later, on November 5, 2014, Cox signed an engagement letter for the Firm to represent Plan B in obtaining a patent regarding the TitleClose product. Patent-application rules prevented her from putting the application in the name of Plan B, so she put it in her own name instead. She testified, however, that "[t]he intention was for Plan B Holdings always to have the patent." Indeed, she testified that she was listed in the application as the inventor and applicant for the patent because "that was an error by Reed & Scardino." Nonetheless, she did not list Plan B as the assignee of the patent. Cox later had the trademark and copyright applications also put in her own name, although that was not a requirement for trademark and copyright applications.

On December 19, 2014, Sense filed suit against CIPE for its unpaid bills. Sense continued to assert in its petition that because it had not been paid for its software-development work, it would retain ownership of the intellectual-property rights for that work, which included the TitleClose platform. This could have meant that CIPE—and therefore Cox—would not have ownership of the TitleClose platform and would not be able to use it legally.

Two months after Sense filed suit against CIPE, on February 26, 2015, Cox registered Plan B to do business in Texas. On the State of Texas registration form, Plan B's "Fictitious Name" was listed as "Shop TitleClose LLC." In this context, "fictitious name" means "assumed name," "trade name," or "dba."

The patent for which Cox/Plan B applied had two aspects: a database of information regarding title companies nationwide and a closing component. The TitleClose platform at that time had an "eClose component," which had not been present before, but it was otherwise similar to the platform Sense had been working to create. Apparently Sense's lawyers

24

became aware of Plan B's involvement, and by mid-2015 there was a growing concern among Cox and members of the Firm that Epic and Plan B could have exposure in Sense's lawsuit. Indeed, on August 15 one of the Firm's lawyers who was working on the Sense litigation emailed Cox that "Plan B appears to have been created solely to pursue the eClose/Portal product after Sense Corp failed to deliver." On October 30 Sense added Epic and Plan B as defendants to the lawsuit.

On December 22, 2015, CIPE, Epic, and Plan B settled the Sense lawsuit for $185,000. The Cox entities borrowed the money for the settlement from another of Cox's companies, Epic Property Solutions.

Cox testified that the source code produced by Sense was "disregarded," but the record contains evidence that the product being used thereafter was similar. She admitted that "the product didn't change." Apparently the primary difference was that a "signature capability" was added to what Sense had produced. Nonetheless, the concept was the same.

The Firm thus represented CIPE, Epic, and Plan B in trademark applications, a copyright application, and the Sense lawsuit. The trademark and copyright applications were handled through Epic, the contract with Sense was with CIPE, and the patent application was through Plan B. The Sense lawsuit was settled, and the trademarks and copyright were successfully obtained, but the patent process was delayed and apparently never finalized. All of these matters related directly to the TitleClose product that Cox had envisioned in 2012.

During 2015 and early 2016, the companies stopped paying the Firm's invoices. Cox testified that she overlooked the invoices because she and the staff of her companies were overwhelmed with work attempting to sell some of her other businesses. In any event, the Firm sent Cox numerous notifications of overdue bills throughout 2015 and 2016 and finally got her attention with a more urgent notification on November 6, 2016. Cox testified that this was the first

time she became personally aware of the past-due invoices. After some preliminary efforts at clarification of the Firm's invoices, Cox had a meeting with representatives of the Firm on January 13, 2017, in an attempt to resolve the fee dispute. The attempt was unsuccessful. In Cox's words, the meeting "did not go well."

On January 27, 2017, two weeks after the unsuccessful attempt to resolve the Firm's unpaid invoices, Plan B's right to do business in Texas was forfeited for failure to pay franchise taxes.[6]

On February 18, 2017, a month after Cox's unsuccessful meeting with members of the Firm, Cox registered a new entity called Yellow Frame, Inc.—of which she owned 55%—to do business in Texas. The 45% owner contributed "cash" for his share, but when Cox was asked whether she contributed the TitleClose product for her 55% interest in Yellow Frame, she testified that she did not know: "That would be handled by my accounting firm." At the time of trial, Cox still owned the TitleClose trademark and, through Yellow Frame, was still using the TitleClose trademark and platform as her business. TitleClose produced net revenue of about $75,000 for Yellow Frame in 2020.

On June 8, 2017, the Firm filed suit against Plan B, CIPE, Epic Real Estate Solutions, and Cox individually for its unpaid invoices. The Firm later dropped Epic from the suit when the company that had purchased Epic paid the Firm's past-due invoices that were attributable to work done for Epic. At the time of trial, CIPE and Plan B were both insolvent.

An alter-ego theory of veil piercing involves two basic elements:

---

[6] That forfeiture was reversed more than a year later, on May 1, 2018, but it was forfeited again, apparently for good, on August 2, 2019.

> Disregarding the corporate structure involves two considerations: (1) the relationship between the entities, and (2) whether the entities' use of limited liability was illegitimate. Thus, to pierce the corporate veil and impose liability under an alter-ego theory, the plaintiff must demonstrate (1) that the entity on which it seeks to impose liability is the alter ego of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on the plaintiff for the defendant's direct personal benefit.

*U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213–14 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008), and *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)).[7]

By ruling against Cox individually, the trial court impliedly found, as a matter of fact, that the foregoing elements existed to pierce the corporate veil between Plan B and Cox. *See Castleberry*, 721 S.W.2d at 277 ("The different bases for disregarding the corporate fiction involve questions of fact."); *accord HHH Farms, L.L.C. v. Fannin Bank*, 648 S.W.3d 387, 409 (Tex. App.—Texarkana 2022, pet. denied). Accordingly, we must examine the record to determine if the court's implied findings are supported by more than a scintilla of evidence.

### Alter ego

The relationship between Cox and her various business entities can be assessed using such factors as:

- whether the entities shared a common business name, common offices, common employees, or centralized accounting;

- whether one entity paid the wages of the other entity's employees;

---

[7] The second element above can itself be said to divide into two discrete parts—"actual fraud" and "for defendant's direct personal benefit"—leading some authorities to refer to a total of three elements: (1) alter ego, (2) actual fraud, and (3) for the defendant's direct personal benefit. *See, e.g.*, *Belliveau v. Barco, Inc.*, 987 F.3d 122, 129–30 (5th Cir. 2021) (applying Texas law).

• whether one entity's employees rendered services on behalf of the other entity;

• whether one entity made undocumented transfers of funds to the other entity; and

• whether the allocation of profits and losses between the entities is unclear.

*Tryco Enters.*, 390 S.W.3d at 509 (citing *SSP Partners*, 275 S.W.3d at 45051).

Here, it is undisputed that Cox was the sole owner of Plan B and CIPE (and others). She had complete control over her businesses. In addition, all of Cox's companies had common employees—contract workers—using the same address, etc. ("[W]e were all in the same building.").

It was common for money to be shifted—"loaned"—from one of Cox's businesses to another, depending on the immediate need. She testified:

Q [by the Firm's attorney]. You said previously there was no money in the CIPE account, that all you had was -- the only asset that CIPE held was this potential for this platform that wasn't developed yet, right?

A [by Cox]. It would be funded as needed to pay the bills.

Q. And it would be funded by you personally?

A. No.

Q. Where would that funding come from?

A. One of the other entities.

Although in the instance cited above, the funding did not come from Cox personally, it is a reasonable inference that the shift in funding came about at Cox's direction. She testified that "I own several entities and because when funding was needed for CIPE it would be a general ledger credit, I guess, from Epic – another of the Epic companies."

This was the case with the funding for the settlement of the Sense litigation—the money for the settlement ($185,000) came from another of Cox's businesses, Epic Property Solutions. As events played out, it is a reasonable inference that CIPE and Plan B never repaid those funds to Epic Property.

Cox's companies used a "shared resource company" to perform various tasks for all the businesses: "Generally my businesses are set up by product and then any shared type of resources, IT, human resources, accounting and so forth were under a shared resource company called Epic Management." Bills were routed directly to the shared accounting group. Again, Cox owned and controlled all of these companies.

We conclude that the record contains more than a scintilla of evidence that Cox, as the sole owner of her businesses, was the "alter ego" of CIPE and Plan B. Nonetheless, this establishes only the first prong of the test for piercing the corporate veil. There must also be some evidence that Cox caused her companies to be used in a way that "perpetrated an actual fraud on the obligee [here, the Firm] primarily for [Cox's] direct personal benefit," i.e., in a way that was "illegitimate" and "involves dishonesty of purpose or intent to deceive." *See* Tex. Bus. Orgs. Code § 21.223(b); *see also SSP Partners*, 275 S.W.3d at 455; *Tryco Enters.*, 390 S.W.3d at 509–10.

*Perpetration of Actual Fraud, i.e., Used for an Illegitimate Purpose*

The factors listed above in the alter-ego analysis "'are almost entirely irrelevant' to the second consideration in determining personal liability under section 21.223—whether the use of limited liability was illegitimate. . . . That determination is made 'based on a careful evaluation of the policies supporting the principle of limited liability.'" *Tryco Enters.*, 390 S.W.3d at 509–10 (quoting *SSP Partners*, 275 S.W.3d at 455).

Here, it is a reasonable inference that Cox placed substantial value on the money-making potential of TitleClose. She had Sense do work preparing the online platform, for which Sense billed CIPE approximately $335,000. After Cox's failure to pay that bill turned into a lawsuit, even the settlement required CIPE (through money provided by another of Cox's entities) to pay Sense $185,000.

Epic was originally the company that was positioned to get TitleClose up and running. Epic would own the TitleClose trademark and copyrights and market the TitleClose product. But because Cox was planning to sell Epic, she had CIPE enter into the contract with Sense to produce the necessary software. CIPE was now positioned to take charge of TitleClose. Things changed, however, when Sense threatened to sue CIPE and to retain ownership of the intellectual-property rights it had been working to develop. Within a month of CIPE's receiving Sense's $335,000 demand letter, Cox got Plan B involved in TitleClose, signing an engagement letter with the Firm to obtain a patent for Plan B relating to the TitleClose product. Soon thereafter she registered Plan B to do business in Texas with a d/b/a of "Shop TitleClose LLC." Although the patent application ended up being in Cox's name individually, she insisted that the owner of the patent was always intended to be Plan B. In this way, whatever profit the TitleClose product eventually produced would not go to CIPE—Sense's contract debtor—but would instead go to

Plan B. And, as discussed above, it is a reasonable inference that Cox expected TitleClose to produce substantial future profits.

This plan was submarined, however, when Plan B and Epic were added as defendants in Sense's lawsuit in October 2015. Worse still, Sense maintained its assertion that it would retain ownership of the intellectual-property rights to TitleClose until its bills were paid in full. If Cox had walked away at this point—perhaps filing bankruptcy for Plan B and CIPE—she might have permanently lost the right to market and use TitleClose. As Cox testified, "CIPE didn't exist without [the TitleClose] software. So to me the software was the asset." Apparently boxed in, Cox seems to have had no choice but to settle the Sense lawsuit, which she did for $185,000, a substantial sum.

Out from under the Sense lawsuit, Cox was free to use Plan B to develop and market TitleClose. But then came the fee dispute with the Firm. Cox testified that she became aware of the unpaid bills in November 2016. Approximately one month after the unsuccessful attempt in January 2017 to settle the fee dispute, Cox registered yet another company, Yellow Frame, Inc., to do business in Texas. At some point thereafter—the exact date is not in the record—Cox began using Yellow Frame to market and use TitleClose. Once again, if TitleClose had continued to be marketed by Plan B and thus produced income for Plan B, that entity might have been able to pay the Firm's bills. But after TitleClose was effectively "moved" to Yellow Frame, Plan B had no assets. Just as Cox had stated that "CIPE didn't exist without [the TitleClose] software[—]So to me the software was the asset," the same could now be said about Plan B. Threatened with a lawsuit by the Firm, Plan B's only "asset"—TitleClose—was quietly moved to Yellow Frame. Having Yellow Frame take over the use and marketing of TitleClose left Plan B insolvent. A mere

31

two weeks after Cox's unsuccessful meeting with the Firm regarding its unpaid bills, Plan B's right to do business in Texas was forfeited for failure to pay franchise taxes.

### *For Cox's Direct Personal Benefit*

Because Cox was the sole owner of Plan B and the majority owner of Yellow Frame, the evidence in the record supports the trial court's implied finding that Cox's actions were taken primarily for her own personal benefit.

In summary, the record contains evidence that whenever the business entity that Cox intended to use and market TitleClose became threatened by creditors, she moved that company's primary (or sole) asset—TitleClose—to a newly created or registered company. We hold that the record contains more than a scintilla of evidence that Cox "caused [Plan B] to be used for the purpose of perpetrating and did perpetrate an actual fraud on the [Firm] primarily for [Cox's] direct personal benefit." *See* Tex. Bus. Orgs. Code § 21.223(b). We overrule Appellants' complaint as to the Firm's piercing-the-corporate-veil claim.

Although it is not necessary as support for the foregoing holding, it is noteworthy that the Fifth Circuit has held that the actual-fraud requirement for piercing the corporate veil is satisfied if the obligee establishes that a transfer is fraudulent under the actual-fraud prong of Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code §§ 24.001–013. *See Thomas v. Hughes*, 27 F.4th 995, 1015 (5th Cir. 2022) ("[T]he elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors." (quoting *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019)) (applying Texas

32

law), and summarizing elements of fraudulent transfer as set forth in Tex. Bus. & Com. Code § 24.005). The present record contains evidence of fraudulent transfer under Section 24.005.[8]

### Attorney's Fees Against Cox

Finally, Cox complains that the trial court erred in awarding attorney's fees against her individually. We have held above that the record does not contain sufficient evidence to support an award of actual damages against Cox individually under theories of breach of contract, sworn account, or quantum meruit, theories that could support an award of attorney's fees. Although we have held that the record does contain evidence of alter ego sufficient to pierce the corporate veil and support Cox's individual liability for the damages awarded against CIPE and Plan B, we have also held that CIPE and Plan B are not liable for attorney's fees. Accordingly, Cox cannot, under a piercing-the-corporate-veil theory, be held individually liable for attorney's fees either. We therefore reverse the portion of the trial court's judgment awarding attorney's fees against Cox.

---

[8] Moreover, while Section 24.005 has "actual intent to hinder, delay, or defraud any creditor" as one of its elements, intent is not an element of Section 24.006:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex. Bus. & Com. Code § 24.006(a); *see Arriaga v. Cartmill*, 407 S.W.3d 927, 931 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("A fraudulent transfer defined by section 24.006(a) does not include intent as an element of required proof.").

## CONCLUSION

Having held that attorney's fees may not be awarded against the companies, we reverse that portion of the trial court's judgment and render judgment that no attorney's fees be awarded against Plan B and CIPE. Having overruled Appellants' issue regarding the trial court's interlocutory award of sanctions against Cox, we affirm that portion of the judgment. Having held that Cox is individually liable to the Firm under a theory of piercing the corporate veil, we affirm the trial court's judgment to the extent it awards actual damages of $83,509.63 against Cox. Having held that Cox is not liable under theories of sworn account, breach of contract, and quantum meruit but only under a theory of piercing the corporate veil, Cox is individually liable only for the amount properly awarded against Plan B and CIPE. Since we have reversed the award of attorney's fees against the companies, we likewise reverse the portion of the trial court's judgment awarding attorney's fees against Cox and render judgment that no attorney's fees be awarded against Cox individually.[9]

_____

J. Woodfin Jones, Justice

Before Justices Baker, Triana, and Jones*

Affirmed in Part; Reversed and Rendered in Part

Filed: October 6, 2023

*Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).

---

[9] In its Appellee's Brief, the Firm requests that we assess monetary sanctions against Appellants for filing a frivolous appeal. We decline that request.

34